# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of: | ) |
| Information stored within the iCloud Account associated with DSID/Apple Account Number 1338547227 and/or email address rickscafedxb@yahoo.com at Apple Inc., One Apple Parkway, Cupertino, CA 95014 | ) ) ) ) ) |

Case No. 2:22-MJ-1530

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 22 U.S.C. §§ 611, et seq., 18 U.S.C. § 207(f), 18 U.S.C. § 1512(c), 18 U.S.C. § 2(a), 18 U.S.C. § 371 | Foreign Agents Registration Act, restrictions on former officers of the Executive Branch, obstruction of justice, aiding and abetting, and conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

*Babak Adib- FBI Special Agent*
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: <u>Los Angeles, CA</u>

_____
*Judge's signature*

Margo A. Roconni- United States Magistrate Judge
_____
*Printed name and title*

AUSA: Daniel J. O'Brien (213) 894-2468

ATTACHMENT A2

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the SUBJECT ACCOUNT, identified as iCloud Account associated with DSID/Apple Account Number 1338547227 and/or email address rickscafedxb@yahoo.com, that is within the possession, custody, or control of Apple, Inc. a company that accepts service of legal process at One Apple Park Way, M/S 169-5CLP, Cupertino, California 95014, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.   **SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of Apple, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT that occurred between October 1, 2016 and the date of this warrant,[1] including:

---

[1] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

iv.   All stored files and other records stored on iCloud for the SUBJECT ACCOUNT, including all device backups, all Apple and third-party app data (such as third-party provider emails and Whatsapp application chats backed up via iCloud), all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain, and all address books, contact and buddy lists,

notes, reminders, calendar entries, images, videos, voicemails,

device settings, and bookmarks;

       b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNT.

ii.  All activity, connection, and transactional logs for all activity relating to each SUBJECT ACCOUNT described above in Section II.10.a. (all log files, dates, times, durations, data transfer volumes, methods of connection, authentication logs, IP addresses, ports, routing information, dial-ups, and locations), including FaceTime call invitation logs, mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), messaging and query logs (including iMessage, SMS, and MMS messages), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My logs, logs associated with device activation and upgrades, and logs associated with web-based access of Apple services (including all associated identifiers);

iii. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files);

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For the SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.  All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of the Foreign Agents

Registration Act, 22 U.S.C. §§ 611, et seq., restrictions on former officers of the Executive Branch, 18 U.S.C. § 207(f), obstruction of justice, 18 U.S.C. § 1512(c), aiding and abetting, 18 U.S.C. § 2(a), and conspiracy, 18 U.S.C. § 371, namely:

      i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

      ii.   Information relating to meetings, messages, conversations, or other interactions with:

- foreign governments or any agency of a foreign government, and their officials, representatives, or agents;

- U.S. government officials or members of Congress;

- Imaad Zuberi, Richard Olson, Ahmed Al-Rumaihi, John Sandweg, or Martin Van Valkenburg; and

- employees or agents of Spark Cognition, Fifth Dimension, or any overseas business entities.

      b.   All records and information described above in Section II.10.b.

## IV.   PROVIDER PROCEDURES

    12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the

service of this warrant.  The PROVIDER shall send such
information to:

    Special Agent Babak Adib
    FBI - Los Angeles Field Office
    Orange County Resident Agency
    Desk: (714) 939-3563
    Cell: (949) 337-5411
    Email: badib@fbi.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide
the name and contact information for all employees who conduct
the search and produce the records responsive to this warrant.
IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the
PROVIDER shall not notify any person, including the
subscriber(s) of each account identified in Attachment A, of the
existence of the warrant, until further order of the Court,
until written notice is provided by the United States Attorney's
Office that nondisclosure is no longer required, or until one
year from the date this warrant is signed by the magistrate
judge or such later date as may be set by the Court upon
application for an extension by the United States.  Upon
expiration of this order, at least ten business days prior to
disclosing the existence of the warrant, the PROVIDER shall
notify the agent identified in paragraph 12 above of its intent
to so notify.

**AFFIDAVIT**

I, Babak Adib, being duly sworn, declare and state as
follows:

1.    I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI") and have been so employed since October
2002.  I am currently assigned to the Orange County Resident
Agency of the FBI Los Angeles Field Office.  Since entering
duty, I have participated in investigations involving criminal,
counterterrorism, and counterintelligence matters.  Prior to
joining the FBI, I worked as an attorney for the County of Clark
in Las Vegas, Nevada.

2.    I have attended FBI Basic Agent Training in Quantico,
Virginia, as well as additional training courses related to
counterterrorism, counterintelligence, and criminal
investigations.  As part of my duties, I have been involved in
numerous criminal investigations and have participated in the
execution of numerous search warrants.

## I.    INTRODUCTION

3.    I make this affidavit in support of applications for
search warrants for the following iCloud accounts (each a
"SUBJECT ACCOUNT") and specifically including associated iCloud
and iTunes accounts, that are within the possession, custody, or
control of Apple Inc., a company that accepts service of legal
process at One Apple Park Way, M/S 169-5CLP, Cupertino,
California 95014-2084, regardless of where such information is
stored, held, or maintained:

1

a.    iCloud Account associated with DSID/Apple Account Number[1] 120757353 and/or email address imaad.zuberi@mindspring.com ("SUBJECT ACCOUNT 1");

b.    iCloud Account associated with DSID/Apple Account Number 1338547227 and/or email address rickscafedxb@yahoo.com ("SUBJECT ACCOUNT 2"); and

c.    iCloud Account associated with DSID/Apple Account Number 270847771 and/or email address j.rutherford.allen@gmail.com ("SUBJECT ACCOUNT 3").

4.    The information to be searched is described in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER

---

[1] Records obtained from Apple show that the SUBJECT ACCOUNTS are associated with the Destination Signaling Identifier ("DSID") numbers.  I have learned through my training and experience that a DSID is a unique ID generated when registering at iCloud.com and assigned to the user.

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

5.  As described more fully below, I respectfully submit there is probable cause to believe that the information associated with SUBJECT ACCOUNTS 1, 2, and 3 constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of the Foreign Agents Registration Act, 22 U.S.C. §§ 611, *et seq.*, restrictions on former officers of the Executive Branch, 18 U.S.C. § 207(f), obstruction of justice, 18 U.S.C. § 1512(c), aiding and abetting, 18 U.S.C. § 2(a), and conspiracy, 18 U.S.C. § 371.

6.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>THE FOREIGN AGENTS REGISTRATION ACT</u>

7.    The Foreign Agents Registration Act ("FARA") prohibits any person[3] from acting "as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement . . . or unless he is exempt from registration . . . ."  22 U.S.C. § 612(a).[4]  FARA's purpose is to facilitate the government's and the American people's evaluation of the statements and activities of such persons in light of their function as foreign agents.

8.    An agent of a foreign principal is required to register with the Attorney General within ten days of becoming an agent.  22 U.S.C. § 612(a).  To establish a criminal violation for failing to register under FARA, the government must prove that the defendant: (1) acted in the United States as an agent of a foreign principal; (2) failed to register with the Attorney General; and (3) acted willfully.[5]  22 U.S.C. § 612(a).

---

[3] The statute includes within the definition of "person" "an individual, partnership, association, corporation, organization, or any other combination of individuals".

[4] One such exemption is available to an agent who has engaged in lobbying activities and who has registered under the Lobbying Disclosure Act of 1995 ("LDA"), 2 U.S.C. § 1601.  22 U.S.C. § 613(h).  The LDA exemption is not available, however, to an agent of a foreign government or a foreign political party, or if the principal beneficiary of the agent's work is a foreign government or a foreign political party.  28 C.F.R. § 5.307.  Due to this limitation and to the fact that none of the subjects of the investigation registered under the LDA, the exemption does not apply to the conduct under investigation in this case.

[5] "Willfully" means to act with knowledge that one's conduct is unlawful and with the intent to do something that the law
*(footnote cont'd on next page)*

9.   As defined by FARA, the term "foreign principal" includes, in relevant part, foreign governments, foreign political parties, individuals located outside the United States who are not U.S. citizens or who are not domiciled in the United States, and businesses organized under a foreign country's laws or that have their principal place of business in a foreign country.  22 U.S.C. § 611(b).  In any action brought under FARA, "proof of the specific identity of the foreign principal shall be permitted but is not necessary."  22 U.S.C. § 618(a)(1).

10.  The term "agent of a foreign principal" is in turn defined, in relevant part, as "any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person (i) engages within the United States in political activities for or in the interests of such foreign principal; (ii) acts within the United States as a public relations counsel . . . or political consultant for or in the interests of such foreign principal; . . . or (iv) within the United States represents the interests of such foreign principal before any

---

forbids, that is to say, with the bad purpose to disobey or disregard the law.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007); *Bryan v. United States*, 524 U.S. 184, 191-196 (1998).

agency or official of the Government of the United States . . .
."  22 U.S.C. § 611(c)(1).

11.  Under FARA, "political activities" are defined to
include "any activity that the person engaging in will, or that
the person intends to, in any way influence any agency or
official of the Government of the United States with reference
to formulating, adopting, or changing the domestic or foreign
policies of the United States or with reference to the political
or public interests, policies, or relation of a government of a
foreign country or a foreign political party."  22 U.S.C.
§ 611(o).  FARA defines the term "political consultant" to mean
"any person who engages in informing or advising any other
person with reference to the domestic or foreign policies of the
United States or the political or public interest, policies, or
relations of a foreign country or of a foreign political party."
22 U.S.C. § 611(p).

### III.  <u>SUBJECTS/TARGETS</u>

<u>Imaad Zuberi</u>

12.  Imaad Shah Zuberi ("Zuberi"), the user of SUBJECT
ACCOUNT 1, is an American businessman who operated a business
entity named Avenue Ventures.  Zuberi's business largely
consisted of receiving funds from foreign clients, using those
funds to make political campaign contributions, parlaying those
contributions into political influence, and using that influence
to change U.S. government policy for his foreign clients.

13.  On November 22, 2019, in *United States v. Zuberi*, CR
19-642-VAP, Zuberi pleaded guilty to a FARA offense in violation

of 22 U.S.C. §§ 612, 618(a)(2), Federal Election Campaign Act offenses in violation of 52 U.S.C. §§ 30116, 30118, 30121, 30122, 30109(d)(1), and tax evasion in violation of 26 U.S.C. 7201. All the aforementioned charges were unrelated to the instant investigation. On June 30, 2020, in *United States v. Zuberi*, CR 20-155-VAP, Zuberi also pleaded guilty to obstruction of justice (witness tampering) in violation of 18 U.S.C. § 1512(c) related to an investigation conducted out of the Southern District of New York. On February 23, 2021, in a consolidated sentencing, the court determined that Zuberi's obstruction extended beyond the single incident charged and that it included his deletion of four email accounts under the domain avenueventures.com exclusively under his control as well as paying several witnesses millions of dollars to silence them in connection with the government's investigation. The court sentenced Zuberi to 12 years' imprisonment.

<u>Richard Olson</u>

14.  Richard Gustave Olson, Jr. ("Olson"), the user of SUBJECT ACCOUNT 2, served as U.S. Ambassador to the United Arab Emirates ("UAE") from October 2008 through May 2011 and U.S. Ambassador to Pakistan from October 2012 through November 2015. From November 2015 through November 2016, Olson held the position of U.S. Special Representative for Afghanistan and Pakistan.

15.  As a senior official of the executive branch, Olson was subject to the one-year "cooling off" provisions of 18 U.S.C. § 207(f) after retirement. Those provisions prohibited

Olson from (a) representing "a foreign entity before any officer or employee of any department or agency of the United States with the intent to influence a decision of such officer or employee in carrying out his or her official duties," and (B) aiding or advising "a foreign entity with the intent to influence a decision of any officer or employee of any department or agency of the United States, in carrying out his or her official duties."  18 U.S.C. § 207(f).

16.  Beginning no later than December 2016, Olson began operating a consulting firm called Medicine Bear Consulting, LLC and worked as a consultant for Zuberi, who paid Olson $20,000 in December 2016 and at least $180,000 over the course of 2017.

17.  On January 14, 2022, Olson entered into a plea agreement with the government that requires him to enter pleas of guilty to Making a False Writing in violation of 18 U.S.C. § 1018 (related to his filing a false financial disclosure form in 2016) and Aiding and Advising a Foreign Government with Intent to Influence Decisions of United States Officers in violation of 18 U.S.C. §§ 207(f)(1)(B), 216(a)(1) (relating to his work in support of Qatar).

<u>John Allen</u>

18.  John R. Allen ("Allen"), the user of SUBJECT ACCOUNT 3, is a retired four-star general with the U.S. Marine Corps. During 2017, Allen was working as a Senior Fellow with the Brookings Institution in Washington, D.C.  On October 4, 2017, Brookings announced Allen's appointment as its president.

<u>Ahmed Al-Rumaihi</u>

19.   Ahmed Al-Rumaihi ("Rumaihi") is a high-ranking Qatari government official.  Rumaihi served as a diplomat for the Government of Qatar from 2013 to 2015, and then again beginning in 2018 to present.  In or about 2014, Rumaihi was appointed head of a $100 billion internal division of the government-owned Qatari Investment Authority ("QIA"), Qatar's sovereign wealth fund.  In or about March 2017, Rumaihi was appointed a member of the Supreme Council for Economic Affairs and Investments ("SCEAI"), to which QIA reports.  The SCEIA was chaired by Qatar's Foreign Minister and was the highest decision-making body concerning energy, investment, and economic affairs in Qatar.

20.   In late 2016, Zuberi entered into an arrangement with Rumaihi and the Qatari government.  On October 25, 2016, Zuberi sent to Rumaihi a draft contract between Avenue Ventures and QIA through which Zuberi would perform consulting services at a price of $3.5 million per year plus a 20% success fee.  Zuberi then sent a nearly identical, alterative draft contract to Rumaihi between Avenue Ventures and a Doha company headed by Rumaihi called Ory Capital.  Although neither of these agreements were signed, on November 14, 2016, Rumaihi transferred $2.8 million from an overseas Qatar National Bank account to Zuberi's Avenue Ventures account at Wells Fargo Bank ("the Avenue Ventures account").  On December 27, 2016, Rumaihi transferred another $3 million to the Avenue Ventures account.

On June 19, 2017, Rumaihi transferred another $4 million to the Avenue Ventures account.[6]

21.  Zuberi's initial work for the Qatari government involved a lobbying effort to secure Department of Homeland Security ("DHS") preclearance facilities for Doha Airport.  In November 2016, Zuberi enlisted an attorney, John Sandweg ("Sandweg"),[7] who prepared a proposal to "help out Qatar with pre clearance" using its "ability to influence this behind the scenes" with DHS, other government agencies, members of Congress.  That same month, Zuberi solicited the help of Olson with respect to preclearance project.  On March 9, 2017, Zuberi transmitted the unsigned Avenue Ventures/Ory Capital contract to Rumaihi along with the message, "this will incorporate preclearance project."  By May 31, 2017, this lobbying effort was largely abandoned due to an international diplomatic crisis between the Qatari government and other Middle Eastern countries.  This crisis spawned another lobbying effort by Zuberi on behalf of the Qatari government.

---

[6] This $4 million transfer may relate to a real estate investment involving Rumaihi or Qatar, Rumaihi's misappropriation of funds from the government of Qatar, an attempt to disguise the nature of the transfer, or a combination of the above.  On February 24, 2017, Zuberi became aware of the government's criminal investigation.  On June 13, 2017, Zuberi sent Rumaihi a $4 million Avenue Ventures invoice to Ory Capital for "real estate projects" with the message, "please *get this paid* this week."  Rumaihi sent the $4 million transfer six days later.  By the week of May 10, 2018, Rumaihi was requesting a refund from Zuberi, asking if Zuberi would "buy my shares."  On May 18, 2018, February 1, 2019, and March 1, 2019, Zuberi made three $1 million transfers to Rumaihi that he characterized too the bank as refunds of investment.

[7] John Sandweg is a former Department of Homeland Security official and attorney who worked as a business partner with Zuberi and provided legal services to Zuberi.

IV.   **STATEMENT OF PROBABLE CAUSE**

A.   Summary of Allegations

22.   By May 24, 2017, the governments of the UAE and Qatar were engaged in a dispute concerning Qatar's alleged support of Islamic terrorist organizations.  On May 25, 2017, members of the U.S. House representatives introduced House Resolution 2712 "to impose sanctions with respect to foreign support for Palestinian terrorism" and identified Qatar as providing financial support to Hamas, a terrorist organization.  On June 5, 2017, several Persian Gulf states, including Saudi Arabia and the UAE, severed diplomatic relations with Qatar and banned Qatar's use of their airspace and sea lanes.

23.   In response to the crisis, Zuberi, Olson, and Allen advised and aided Qatari government officials.  Zuberi, Olson, and Allen met with Rumaihi, Qatar's Foreign Minister, and the brother of Qatar's Emir (Head of State) in the United States.  Olson and Allen met with the Emir, the Qatari Foreign Minister, and other senior Qatari government leaders in Doha, Qatar.  The primary focus of these discussions was to help the Qatari government determine what support it should seek from the U.S. government and how that support could be obtained.

24.   As requested by Qatari government officials, Allen corresponded with, met with, and successfully lobbied U.S. Executive Branch officials in the United States to release public statements sought by Qatar.  Allen also solicited Executive Branch officials to meet personally with Qatari government officials.

11

25.   Zuberi arranged meetings between Qatari government officials and members of Congress so that Qatari officials could themselves lobby U.S. policymakers on Qatar's behalf.  At one of these meetings, Zuberi, Olson, and Allen met with members of Congress to rebut arguments voiced by members of Congress and to convey the Qatari government's viewpoint and its desires.

26.   Allen sought compensation for his efforts.  With respect to his trip to Doha, Allen sought a $20,000 "speaking engagement" fee and travel expenses.  Allen also sought a longer-term compensation arrangement through Zuberi to be discussed upon their return from Doha.

27.   Zuberi agreed to pay the $20,000 speaker's fee and Allen's travel expenses in connection with the meetings in Doha. Financial records confirm that Zuberi paid Allen's travel expenses in the form of first-class airfare to and from Doha. The investigation has not uncovered evidence that Zuberi paid the "speaking engagement" fee or any other compensation to Allen.

28.   At the same time he was lobbying U.S. government officials on behalf of Qatar, Allen pursued at least one multi-million-dollar business deal with the Qatari government on behalf of a company on whose board of directors he served.

29.   Olson received compensation for his role in the Qatar lobbying effort through his $20,000 per month consulting fee arrangement with Zuberi.  In particular, Olson submitted an invoice to Zuberi in the amount of $20,000 for services rendered

during the month of June 2017 and $92.79 for expenses incurred in connection with the lobbying campaign.

30.   In response to subpoenas served upon them, Allen and Olson failed to produce emails pertaining to the Qatar lobbying effort that were produced to the government from other sources, including documents in which Allen solicited a "speaking engagement" fee and other compensation for the lobbying effort. Search warrants executed for Olson's rickscafedxb@yahoo.com account and Allen's j.rutherford.allen@gmail.com account revealed that the emails they failed to produce no longer exist on provider servers.  In an interview subject to a limited use immunity agreement,[8] Olson admitted that in the spring of 2019, after he became aware of the government's investigation of Zuberi, Zuberi asked him to delete emails pertaining to Allen from his rickscafedxb@yahoo.com account to protect Allen from government investigators.  Olson admitted that he deleted emails in response to that request.

31.   On July 20, 2020, Olson suggested to Zuberi that they coordinate their stories to present a false portrayal of events, claiming that Allen was recruited for the purpose of setting up a military advisement board ("MAB") (which would not implicate FARA) instead of lobbying U.S. government officials with respect

---

[8] Olson obtained counsel in connection with the government's investigation on or about August 31, 2020.  The government interviewed Olson, subject to limited use immunity agreements, on three occasions, in October 2020, November 2020, and March 2021.  Each agreement precludes the government from offering into evidence in any proceeding statements made by Olson but permits the government to use "information derived directly or indirectly from the meeting for the purpose of obtaining and pursuing leads to other evidence."

to the diplomatic crisis.  In one of his immunized proffer sessions, Olson later acknowledged that Allen had actually been recruited to assist Zuberi's lobbying campaign in support of Qatar's response to the diplomatic crisis.

32.  On August 4, 2020, during a recorded interview with the government, Allen adopted the same false version of events Olson suggested to Zuberi.  Allen claimed that his initial contact with Zuberi related to the creation of a military advisement board for the government of Qatar.  Allen also falsely claimed that he never discussed financial compensation with Zuberi in connection with the diplomatic crisis.

33.  According to PROVIDER, Zuberi's imaad.zuberi@mindspring.com email account, Olson's rickscafedxb@yahoo.com email account, and Allen's j.rutherford.allen@gmail.com email account were associated with their respective Apple iCloud accounts (SUBJECT ACCOUNTS). According to PROVIDER, Zuberi, Olson, and Allen all subscribed to iCloud account services, which can be utilized by users to store the data from their devices, including photos, iCloud mail (emails), contacts, calendars, notes, messages (MMS, SMS, and iMessages), as well as data from third-party applications, such as WhatsApp chats.

B.   Background on the 2017 Gulf Diplomatic Crisis

34.  According to open-source reporting, on May 24, 2017, cyber hackers, reportedly funded by the UAE, entered the Qatari News Agency website and posted false statements purportedly from the Emir of Qatar and that appeared supportive of Iran.  Hackers

also leaked emails of UAE Ambassador to the United States Yousef Al Otaiba in which Otaiba reportedly discussed Qatar's support for the Muslim Brotherhood, Hamas, and other militant groups.

35.  The next day, several members of the U.S. House of Representatives, including representatives Edward Royce, Eliot Engel, and Ted Lieu, introduced House Resolution 2712 "to impose sanctions with respect to foreign support for Palestinian terrorism[,]" which identified Qatar as providing financial support to Hamas.

36.  On or about June 5, 2017, the UAE and other Gulf states cut ties with Qatar and closed all air and sea lanes to the country, citing Qatar's alleged support for Iran and terrorism.

C.  The Lobbying Scheme

37.  Zuberi and his associates viewed the diplomatic crisis as a business opportunity and sought to organize a lobbying campaign in support of Qatar to convince the United States to intervene, defuse the possibility of sanctions, and negotiate a resolution favorable to Qatar.

38.  According to emails obtained by the government, on June 1, 2017, Zuberi emailed Olson, attorney John Sandweg, and Rumaihi, and suggested they meet in Washington, D.C. "to see what they would recommend for Qatar to hire in DC."  On June 2, Zuberi and Sandweg discussed planning a lobbying campaign for Qatar.  They planned to assemble a team of former U.S. government leaders with expertise in terrorism to combat the "myth" that Qatar had financed terrorism.  Zuberi suggested that

Sandweg contact the Ashcroft firm, a law firm founded by former U.S. Attorney General John Ashcroft, to participate.

39.  On June 6, Zuberi, Olson, Sandweg, and an attorney for the Ashcroft firm met with Rumaihi at the Willard Hotel in Washington, D.C. to discuss a lobbying campaign.  According to Martin Van Valkenburg — a Zuberi associate who arranged meetings and acted as Zuberi's secretary or chief of staff — after the meeting, Zuberi told Van Valkenburg that the meeting participants agreed that the Ashcroft firm would contract directly with the government of Qatar, coordinate with Rumaihi, and register under FARA.[9]  They discussed engaging a public relations campaign and a strategic messaging campaign directed toward the Trump Administration, the U.S. Senate, and the U.S. House of Representatives to promote Qatar's military and financial collaboration with the United States on counterterrorism security.

40.  Van Valkenburg's notes reveal that on the evening of June 6, Zuberi had dinner with Representative Ed Royce, who chaired the House Foreign Affairs Committee ("HFAC") that had introduced HR 2712.  At the dinner, Representative Royce agreed to work with the Qatari Ambassador and to schedule a lunch with members of Congress at the Charlie Palmer restaurant in

---

[9] The Ashcroft firm signed an engagement letter with Rumaihi on June 7, 2017.  The firm filed a FARA Registration Statement listing the Government of Qatar as the foreign principal, and the Ashcroft firm attorney filed a Short Form FARA Registration Statement.  In subsequent FARA filings, the Ashcroft firm reported payments to Sandweg's firm and other subcontractors.

Washington, D.C. to discuss the situation.  At Zuberi's request, Van Valkenburg reported the details of the dinner to Rumaihi. On June 7, Zuberi had lunch at the Charlie Palmer restaurant with several House representatives, including Royce and Lieu, who had been among the representatives who introduced HR 2712.

### D.   Allen Agrees to Assist Qatar

41.  On June 6, 2017, Olson emailed Zuberi and reported that he had reached out to Allen, that Allen was "interested in helping out" regarding Qatar, and that Allen had asked to meet with Zuberi.  Over the course of the evening of June 6 and the morning of June 7, using rickscafedxb@yahoo.com, Olson introduced Allen, who was using j.rutherford.allen@gmail.com, to Zuberi, who was using both imaad.zuberi@mindspring.com and his Avenue Venture email account.  On the morning of June 7, Zuberi and Allen spoke by telephone.

42.  At 2:00 p.m. on June 7, right after the lunch with members of Congress, Zuberi, Allen, Olson, and Van Valkenburg met at the Willard Hotel in Washington, D.C.  According to information provided by Van Valkenburg during a voluntary interview with the FBI, at the Willard Hotel meeting, Allen provided an appraisal of various U.S. government officials who would play a role in the crisis.  He also explained the tactics likely to be employed by the UAE and Saudi Arabia.  Allen suggested that the Qataris publish an "open letter to America" in the New York Times in which they could emphasize their shared interest in fighting the war on terror.  Allen agreed to solicit potential op-ed authors as mouthpieces for the Qatari view and

said that he would consider writing the op-eds personally.[10]
Allen also agreed to assist Zuberi with another endeavor he was
promoting by serving on a "Military Advisement Board" that would
advise Qatar on how to improve its military capabilities.

43.   On June 7, following the Willard Hotel meeting and
prior to engaging in any efforts with respect to the diplomatic
crisis, Allen, using j.rutherford.allen@gmail.com, emailed
Zuberi and Olson, at imaad.zuberi@mindspring.com and
rickscafedxb@yahoo.com, respectively, to discuss a possible trip
to Doha and to request compensation for related expenses,
stating, in relevant part,

> **[I]f there is an intent that I'll help the Emir and
> Qatar, we'll need to define that relationship** if you're
> willing.  In the short term, if we're serious considering
> my going to Doha, i can leave FRI, but need to be back
> MON. ... Please let me know if there's a desire for me
> to do this.  If so, **I'd be deeply grateful if someone
> could assist me in procuring the airline tickets** and
> setting up the logistics for the trip.  I'm prepared to
> have another conversation.[11]

During the evening of June 7 and the morning of June 8, 2017,
Olson spoke to Zuberi and Allen to resolve Allen's desire to
"have a chat about numbers" prior to traveling to Doha.  During
the morning of June 8, Olson conveyed Zuberi's thoughts on the
matter to Allen.  In response, Allen emailed Olson and Zuberi,
suggesting that they "call and treat my visit to Doha over the

---

[10] While numerous op-eds were written in support of Qatar in
the following weeks, the FBI does not currently possess any
evidence that those op-eds were solicited or written by Zuberi,
Allen, or any other participant in the lobbying effort.

[11] Neither Allen nor Olson produced this email in response
to grand jury subpoenas.

weekend as 'a speaking engagement,' which I've done before, for
which I'd be compensated at my standard rate" and that they
"work out the fuller arrangement of a longer term relationship
over the weekend":

> I'm prepared to get on a plane tomorrow to travel to and
> from Doha over the weekend to have discussion with
> relevant parties there.  It is not possible for me to
> turn a proposal before I get on a plane on FRI, as I
> have contractual/legal obligations with several
> companies, as well as Brookings, to submit any
> employment arrangements, beyond my current relationships
> with them, for their legal review.  I have no reason to
> believe they shouldn't ultimately concur with our
> arrangement, but it's not possible to do this before
> tomorrow.  **What we can do is call and treat my visit to
> Doha over the weekend as "a speaking engagement", which
> I've done before, for which I'd be compensated at my
> standard rate.  Then we can work out the fuller
> arrangement of a longer term relationship over the
> weekend** as I transition back and forth.  I'd then take
> that proposal to my own attorney and the other companies.
> . . .  **Please let me know with whom I should work on
> travel arrangements.**[12]

44.   According to documents produced to the government by
Allen, shortly thereafter, during the lunch hour, Allen attended
a Brookings-moderated forum that featured as a speaker H.R.
McMaster, who was then the U.S. National Security Advisor.
Allen later recounted in an email to McMaster and other
officials on the National Security Council ("NSC") a
conversation in a holding room prior to the conference.  There,
Allen informed McMaster and others that he had "been close to
the Qataris for a long time" and that he had the "trust" of
their "key leaders."

---

[12] Neither Allen nor Olson produced this email in response
to grand jury subpoenas.

45.   As reflected in WhatsApp exchanges and notes produced to the government by Olson supported by toll records, at approximately 4:00 p.m. on June 8, Zuberi, Allen, and Olson discussed the trip to Doha and Allen's compensation on a 21-minute conference call.  Olson's contemporaneous notes on the conference call show that Zuberi agreed to pay the group's travel expenses and Allen's speaking fee but emphasized the need for secrecy.  Zuberi then referenced the legal entity through which Rumaihi had fashioned a consulting agreement with Zuberi:

Conference Call w/ John Allen; Imaad

8 JUN 17 – 1600

Allen can go to Doha this weekend

Imaad to make travel arrangements & pay JA [John Allen] speakers fee

Imaad: Confidentiality

JA [Allen] Back by Monday 12th

ORI Capital

46.   According to Olson's immunized proffer, the agreed-upon amount for the "speakers fee" was $20,000.

47.   After the call, WhatsApp exchanges show that Zuberi travelled to Olson's home to pick him up for an in-person meeting with Allen that evening.  Just prior to his arrival, at 4:56 p.m., Zuberi sent Olson the message, "If we can do this we will own half of Qatar."

48.   According to a voluntary interview with Van Valkenburg and Olson's immunized proffer, Zuberi, Allen, Olson, Van

Valkenburg, and Rumaihi met in Washington, D.C. on the evening
of June 8.  At Zuberi's invitation, the Turkish Ambassador to
the United States attended a portion of the meeting as well.
According to Olson's contemporaneous notes, at 6:00 p.m.,
Rumaihi related Qatar's perspective on the diplomatic crisis.
Rumaihi then requested an official statement from the U.S.
government asking for de-escalation, and the group discussed
ways to procure such a statement.  Olson's notes state, in
relevant part,

> Ahmed [Rumaihi]:  No travel by Emir as long as Q[atar]
> under siege, close everything air, sea […]

> Imaad [Zuberi]:  Told Turk Amb[assador] not to deploy
> troops

> Tu[rk] ambassador:  Erdogan contacting region to de-
> escalate

> Acknowledge POTUS offer & persuade the Emir to come to
> US

> Tu[rk] ambassador:  Engage [Foreign Minister] in
> Kuwait move up to UofS

> **Statement from USG [US Government] – Deescalate the
> sit [situation]** – Qatar will welcome

> No press

49.  Later that evening, Zuberi purchased airfare for
himself, Allen, Olson, Van Valkenburg, and Rumaihi to travel to
Doha the following day, and personally forwarded the tickets to
the recipients via email.

E.   Allen Begins Lobbying McMaster Regarding Qatar

50.  The next morning, on June 9, Allen emailed McMaster
and others at the NSC, using a Brookings email account, to

convey Qatar's perspective on the crisis and to make a request on behalf of that foreign government:

> To the point of this note, please ... as you all may have heard yesterday in the holding room, and as you may know, I've been close to the Qataris for a long time and to that extent, I have their trust at several levels and among a number of the key leaders.  They've asked me to shoot out to Doha over the weekend to discuss their situation.  I'll leave tonight and will report fully to you on the outbound leg probably late SUN or MON.  I'll be back MON latest.  Having the background info you mentioned, H.R., would be very helpful.

> From the POTUS phone call with the Qatari Emir on WED, I think the POTUS desire/offer to solve this through WH mediation is masterful.  I told the Qs they need to seize on this opportunity very quickly as POTUS has thrown the Qataris a lifeline in this crisis . . . .

> **H.R., the Qataris are asking for some help, though, in the short term.**  In their terms, the closure of the airspace in the region, and specifically the closure of the land border, places the emirate effectively "under siege" ... their term. ... **What they're asking is a follow-on signal to the region from the WH or DOS of a simple statement from the US: "... calling on all sides to seek a peaceful resolution to this crisis [and to act with restraint]."  The bracketed phrase ... to act with restraint ... is something they're specifically asking the US to say."**

> Depending on the effectiveness of the Kuwaiti initiative, and should they set the conditions for a us-led mediation, **I'd assume we'd quietly ask the saudi/Emirati side to open the border/lift the airspace restrictions as an act of good will and good faith to POTUS (not to the Qataris, but to POTUS), permitting "the lifting of the siege" and enabling the Emir of Q to travel for the final mediation.**

51.  In this email, Allen misrepresented to McMaster and other NSC officials the nature of his involvement in the matter.  He suggested that his involvement stemmed solely from his own prior relationship with Qatari leaders when, in fact, Zuberi and Olson introduced him to Rumaihi, who invited him to travel to Doha.  Allen also made no mention that he had been enlisted to

participate in Zuberi's lobbying efforts, that his expenses were to be paid by Zuberi, that he had solicited and agreed to accept a "speaking engagement" fee (without giving a speech) to discuss the situation with Qatari officials, and that he had sought a longer-term compensation arrangement with respect to the lobbying efforts.

52.   According to documents produced by Allen, in response to Allen's representations regarding how he became involved in Qatar's efforts to resolve the diplomatic crisis, McMaster agreed to provide Allen with NSC information to assist his efforts.   Although Allen subsequently spoke by telephone with at least one NSC staffer in an attempt to obtain the information, it does not appear that Allen ever received the promised information from the NSC.

53.   In a voluntary interview with the FBI, McMaster confirmed that Allen did not disclose to him that he had been solicited by Zuberi and Olson, who were engaged in a lobbying and public relations campaign on behalf of Qatar, that he had provided Zuberi and Olson and Rumaihi, a Qatari government official, advice on the campaign, that he sought to receive a "speaking engagement" fee and his expenses paid in return for his agreement to travel with Zuberi to Doha to discuss the crisis with senior Qatari officials, or that he sought longer-term compensation for his work in support of Qatar.

    F.   The U.S. Government Grants Qatar's Initial Request
         Following Allen's Lobbying

54.  Prior to Allen's interactions with McMaster, President Trump publicly stated his support for the UAE/Saudi blockade of Qatar on the ground that it would dissuade Qatar from supporting terrorist organizations.  On June 6, at 8:06 a.m., he stated in a tweet, "During my recent trip to the Middle East I stated that there can no longer be funding of Radical Ideology.  Leaders pointed to Qatar - look!"

55.  On June 7, after President Trump spoke with the Emir of Qatar, the White House released an official statement declaring that the solution was to stop the promotion of terrorism:

> "[T]he President emphasized the importance of all countries in the region working together to prevent the financing of terrorist organizations and stop the promotion of extremist ideology.  The President reiterated that a united Gulf Cooperation Council and a strong United States-Gulf Cooperation Council partnership are critical to defeating terrorism and promoting regional stability.  The President offered to help the parties resolve their differences, including through a meeting at the White House if necessary."[13]

56.  Two days later, on the morning of June 9, Allen conveyed to McMaster Qatar's request that the White House or Department of State issue a statement "calling on all sides to seek a peaceful resolution to this crisis and to act with restraint" with the ultimate goal of lifting the blockade.  That afternoon, U.S. Secretary of State Rex Tillerson did precisely that.  In a public statement, Tillerson shifted away from

---

[13] *See* https://www.whitehouse.gov/briefings-statements/readout-president-donald-j-trumps-call-amir-sheikh-tameem-bin-hamad-al-thani-qatar/.

earlier statements by the White House, urged restraint, and asked the Gulf States to ease the blockade:[14]

> We call for calm and thoughtful dialogue with clear expectations and accountability among the parties in order to strengthen relationships. **We ask that there be no further escalation by the parties in the region...**

> We call on Qatar to be responsive to the concerns of its neighbors. Qatar has a history of supporting groups that have spanned the spectrum of political expression, from activism to violence. The emir of Qatar has made progress in halting financial support and expelling terrorist elements from his country, but he must do more and he must do it more quickly...

> **We call on the Kingdom of Saudi Arabia, the United Arab Emirates, Bahrain, and Egypt to ease the blockade against Qatar.** There are humanitarian consequences to this blockade...

G.   <u>Allen and Olson Meet with Qatari Government Officials in Doha, Qatar</u>

57.   According to voluntary interviews with Allen, Olson, and Van Valkenburg and travel records, Zuberi, Allen, Olson, Van Valkenburg, and Rumaihi travelled to Doha over the weekend of June 10-11, 2017.  They arrived late in the afternoon on June 10, checked into the Four Seasons Hotel, and departed early on the morning of June 11.

58.   According to Olson's voluntary interview subject to a limited immunity agreement, Allen and Olson met with U.S. Ambassador to Qatar Dana Shell Smith ("Ambassador Smith") prior to meeting with Qatari government officials.  Allen told Ambassador Smith the purpose of their trip.  Ambassador Smith

---

[14] *See* Tillerson June 9 Statement to the Press, https://www.state.gov/remarks-on-the-middle-east/.

explained that the Trump Administration was divided as to how to respond to the crisis.

59. Afterwards, Zuberi, Allen, and Olson travelled to the royal palace and met with the Emir, the Emir's brother, the Foreign Minister, the Defense Minister, and other senior officials. Prior to substantive discussions, the Qataris excluded Zuberi from the meeting.

60. According to Olson's contemporaneous notes, the meeting had two segments. The first substantive discussion involved Allen, Olson, Rumaihi, the Emir, the Emir's brother, and the Foreign Minister. The participants discussed how to convince the Trump Administration to help Qatar with respect to the diplomatic crisis. According to Olson's notes, Allen provided the Qatari government officials strategic advice on this issue.[15]

61. According to Olson's notes, Allen and Olson made clear to the Qataris that they were appearing before the Emir as "private citizens," but had connections with Trump Administration officials that placed them in a position to help Qatar:

> [they are] "private citizen[s]"
>
> [Qatar has] "lot of friends" [in Trump Administration] "Mattis, R. Tillerson, John Kelly, H.R. McMaster" [who were] "pleased [they are] coming"

---

[15] Although this meeting provides important context, because it occurred outside the United States, the government does not allege that Allen's or Olson's conduct during the meeting required registration under FARA. *See* 22 U.S.C. § 611(c)(1).

"great to have Ahmed" [Al-Rumaihi] there [in US]

[Secretary Tillerson] "huddling, [illegible word] of statement – now drafting it – working on lifting siege."

62.   Allen and Olson provided specific advice as to how the Qataris should proceed.  According to Olson's notes, this meant embracing U.S. involvement, flattering the President, accepting the President's offer to mediate, and signing the pending deal to purchase F-15 fighter jets from the United States:

"embrace US at this moment, strong rel[ations] w/ US, long & deep ties"

"take up POTUS offer to mediate" [because it would create the] "appearance of equality"

"sign the F-15 deal next week"

"reinforce in public" [and] "compliment POTUS"

"if POTUS [is] under fire, [it] limits options for Mattis, Tillerson"

"set conditions for HH [His Highness, the Emir] to walk into Oval Office"

63.   Olson's notes further reflect that the Government of Qatar changed its strategy in light of this advice and decided to adopt a more conciliatory position vis-à-vis the U.S. government.  Initially, the Qataris perceived conflicting signals emanating from the U.S. government, especially due to President Trump's stated support for Saudi Arabia's and the UAE's positions.  Olson's notes show that the Qatari Foreign Minister responded to Allen's and Olson's advice:

"Thanks for advice, know we have friends, Mattis, Tillerson"

"did not see clear position" [of US govt,] "DOD talking base [Al Udeid], DOS expecting more"

"US should not be neutral" [about blockade]

27

"UAE and "KSA" [Saudi Arabia] felt [they] had a green light from POTUS, not necessarily rest of govt, Mattis & Tillerson working as rest of gov. to work this."

U.S. can "expect to see our language less provocative"

64. Olson's notes also show that Allen and Olson stressed the importance of competing with Saudi Arabia's active lobbying campaign in the United States. They argued that they could mold the opinions of U.S. officials, through McMaster, to align with Qatar's view, and suggested that the Qatari government use the United States' Al-Udeid Air Force base in Qatar as leverage to exert influence over the U.S. government:

"A[llen]: Iraq, [illegible], al Udeid, [illegible] – Q[atar] planes w/ US in Syria – we need to emphasize closeness"

"POTUS offered to mediate – doesn't know about [illegible], NSA – H.R. – Mattis"

"embrace his offer to mediate"

"shape thru H.R. [McMaster]"

"POTUS captured by the KSA [Saudi] view -- 5 mos, solve siege … Reach out to POTUS"

"MbZ [Abu Dhabi Crown Prince], Salman [Saudi Crown Prince] reaching out – you're behind"

"Rumaihi now understand, that if American don't interfere, it won't be solved"

[Allen]: "Americans can level the playing field – no one country out here can do it." "If [the F-15 deal is] cancelled, [relations] would be undercut."

[The Emir]: "We want to sign, [we] want the deal" but he says "for me to do [it] under siege -- ?"

[Allen]: "send [Minister of Defense]" to the U.S. to sign the F-15 deal because it "signals your commitment." "weakens other side"

28

[The Emir]: agrees and says "Khaled [Minister of Defense is] going"

[Foreign Minister]: "commitment is there" but wants "suggestions on timing/sequencing"

[Emir's brother]: "we are behind on perception" "sense of abandonment" "feeling we are thrown under the bus"

[Allen]: "MbAR[ahman] - Rex tonight" "try to speak to POTUS".

[Emir brother]: "no talks while under siege"

[Qatar]: "start to mediate, de-escalate" "so what is the advice?"

[Allen]: "Kusher [is] overloaded" . . . "work w/ Tillerson" . . . "Lift the siege"

[Qatar]: "will send K Attiyah [Minister of Defense] & exploratory team"

65.  During the second segment of the meeting, Allen and Olson met with the Qatari Minister of Defense and the Head of Qatari Intelligence.  Olson's notes show that the advice continued to focus on responding to the diplomatic crisis:

[Americans]: "as private citizen[s]" "talked about your trip - less the ceremonial signing - but sign the deal - embrace the Qatari help"

Allen: "Trump [illegible] self in to mediate" "Tillerson, great advocate, understanding in West Wing" [Qatar has] "leverage on POTUS" "call it in on him to do solution - seek private mtg. thru Mattis - urge Mattis to intervene"

[Minister of Defense]: discusses Qatar's past help to the United States but Qatar is "weak in promoting our story"

Allen: "full spectrum of info. ops - black to white - information [illegible] "not in control of the narrative"

[Foreign Minister]: "Tillerson call - nothing clear"

Allen: advises Qatar encourage parties to "resolve [dispute] to American standard" an form an "Info Task Force" to "own the narrative"

66.   The morning after the meeting with Qatari government officials, Zuberi bitterly complained to Olson about having been excluded from Olson and Allen's meeting with the Qatari government officials, stating in WhatsApp communications produced by Olson, in relevant part:

> Zuberi:  "Fuck the Emir. I have never been treated like this.  I am pissed at you and the General as well.  You guys should have stepped in and said no you should stay. After all I got you and him into this?  I guess you guys need to learn some loyalty.
>
> **Does Gen Allen know his place or his position?**  He is not that important so he should not play the part that he is important.  **I think you need to make it clear to him he is here because of you and I.**  He needs to understand this clearly.  He is being played by Ahmed and I will take care of Ahmed in my own way separately"
>
> Olson:  **"I briefed John [Allen], he understands and fully appreciates that you pulled this all together"**

67.   On June 12, Zuberi exchanged emails with Allen,[16] who was using j.rutherford.allen@gmail.com, and the two agreed to continue to pursue profitable objectives:

> Allen:  Thank you again for facilitating what I think were very important talks with the Qataris.  They couldn't have taken place without your leadership.  I deeply regret your treatment SAT night.  It was not right.
>
> Zuberi:  Good.  Thanks.  Lets move forward with this and other project we talked about i.e. investments.
>
> Allen:  I look forward to the conversation about the future, Imaad.  I think there's a lot of opportunity.

68.   These emails demonstrate that Allen and Olson's trip to Qatar was accomplished through Zuberi's influence — not through Allen's personal connections with Qatari officials, as

---

[16] Allen failed to produce this email chain in response to a subpoena.

he claimed to McMaster.  The emails further reveal that Allen's motivation to help Qatar was financial in nature, as detailed further below.

      H.    Allen Continued Lobbying Administration Officials
            After Returning from Doha

      69.  Allen's request that the U.S. government publicly call for restraint continued to yield results for Qatar.  On June 11, McMaster informed Allen via email, "We received the message and have sent private communications that calls for restraint and a rapid end to the crisis/relaxation of the blockade.  I look forward to hearing your advice."

      70.  On June 12, Allen, using j.rutherford.allen@gmail.com, emailed Sally Donnelly, a U.S. Department of Defense official and senior advisor to the Secretary of Defense, that he had traveled to Qatar and met for two and a half hours with the Emir, the Foreign Minister, the Defense Minister, the Head of Intelligence, and the Emir's brother "who's tasked with dealing with this crisis."  In his report, he relayed Qatar's "collective view" that "Tillerson is committed to solving this crisis, others are not" and that Qatar was "concerned POTUS appears to contradict Tillerson & others in US."  He also set forth the "advice" he rendered to the Qataris: "Stay close to Tillerson & extol POTUS willingness to mediate[,] Don't comment on POTUS tweets[,] [and] Go forward with F15 deal."  Allen also noted that Qatar intended that the Minister of Defense would bring a team to Washington, D.C. to work with White House and

others to "dispose of allegations" and embrace "calls for restraint" and "dismantling of siege measures."

71.  However, Allen's report omitted information suggesting his agency on behalf of Qatar, including his enlistment by Zuberi and Olson, his solicitation and agreement to accept money for his services, and his suggestions that the Qataris could "shape" the President's opinion through McMaster, use "leverage" against the President through the Al-Udeid Air Base, and use "the full spectrum of info ops. - black and white" to "control the narrative" in the United States.[17]

72.  On June 15, 2017, at approximately 6:30 p.m., Allen spoke with McMaster by telephone to discuss his trip to Qatar. In an email that day, Allen characterized it as a "great call." In his voluntary interview with the FBI, Allen claimed to "have no specific recollection of anything that was said in the call."

73.  On June 15, 2017, at approximately 7:00 p.m., Zuberi, Allen, and Olson met with the Emir's brother at the Hay Adams Hotel in Washington, D.C.  Olson's journal reveals that Allen informed the Emir's brother that he had "briefed HR [McMaster] & Kushner" and that the Emir's brother was "seeking 45 minutes for

---

[17] According to calendar entries produced by Allen, on June 15, at 2:30 p.m., Allen may have met with the Qatari Ambassador to the United States at the Cosmos Club in Washington, D.C.  In his voluntary interview, Allen stated that he did not recall whether he met with the ambassador or not and pointed out the fact that his calendar entry included the letter "T," which means "tentative."  Records produced by the Cosmos Club indicate that Allen visited around the lunch hour, which corresponds to another Allen calendar entry for a meeting with a different person.

McMaster."  Allen made this request of McMaster in an email the
following morning,[18] stating, in relevant part,

> Noting your comment about your not seeing the Qataris
> while in DC, H.R., the Qataris are requesting a meeting
> with you next week ... WED/21 JUN or THU/22 JUN ... with
> the Qatari FM [Foreign Minister] and the Emir's brother.
> For the purposes of this crisis they have lead within
> the Qatari government. I truly believe if you can find
> 45 min to spend with them you'll be impressed with the
> seriousness and dedication Qatar is prepared to exert in
> resolving this crisis.

74.  That evening, on June 16, 2017, Allen reported to
Zuberi, Olson, and Rumaihi that he "asked the National Security
Advisor (McMaster) to meet the FM (Foreign Minister) and Sheikh
Mohammad next WED/THU.  I will advise immediately if I hear
anything."  Allen's announcement spawned overlapping email
discussions that demonstrate how Allen was working in
conjunction with Zuberi and Rumaihi and how such back-channel
efforts could more effectively change U.S. policy than requests
submitted by the Qatari government.

75.  Allen distinguished his efforts from requests issued
by the Qatari government as follows:

Rumaihi:  Thank you for the update

Allen:    This request went personally from me to him

Rumaihi:  But I think after you mentioned to Mohammed
bin Hamad [Emir's brother] he had the embassy send in
a request for him

---

[18] According to Allen's calendar entries and records from
the Cosmos Club in Washington, D.C., Allen appears to have met
with (an unidentified) member of Congress that morning.  The
email to McMaster appears to have been sent just minutes after
the Cosmos Club meeting concluded.

> Allen:    The difference is the embassy request has to
> work its way up, our request will come down from
> above. Lets hope we make it one way or the other
>
> Rumaihi:  Yes, theirs will have to go through state. I
> hope yours comes back first.
>
> Zuberi:   He [Emir's brother] is stupid to have the
> Qatari Embassy in Washington make the request when
> General Allen said he will handle it

76.   Both Zuberi and Rumaihi demonstrated that they

believed Allen's work was part of a joint effort conducted on

behalf of the Qatari government:

> Zuberi:   Thank you. I suggest either you or Rick
> ought to attend with Qataris. If we are doing the work
> then we should be involved
>
> Rumaihi:  I agree with Imaad
>
> Allen:    We should shift this conversation to
> WhatsApp. I'll let Rick speak for himself regarding
> his legal restrictions in dealing with the USG. And if
> we want to kill this meeting in the West Wing before
> it's even scheduled, it will never happen if I am an
> attendee. If it happens, I can get a read out from the
> National Security Advisor and we can meet with the
> Qataris after.

77.   In an email dated June 23, 2017, Allen again asked

McMaster to meet with the Emir's brother and the Qatari Foreign

Minister during their visit to Washington the following week.

On June 25, McMaster declined, telling Allen that Tillerson was

taking lead with respect to the crisis.  Allen then reported

this fact to Zuberi and Olson, stating, "I wish this was better

news."  According to open-source reporting, Secretary Tillerson

met with the Qatari Foreign Minister on June 27, 2017.

I.    Zuberi, Allen, and Olson Lobbied Members of Congress

78.   Emails, WhatsApp communications, and calendars

obtained during the investigation reveal that throughout the

month of June, Zuberi arranged for members of Congress to meet with himself, Allen, Olson, and representatives of the Qatari government.  As discussed above, on June 6, Zuberi had a personal dinner with HFAC Chairman Ed Royce at which they discussed the importance of working with the Qatar Ambassador and other members of the HFAC.  They agreed to schedule a lunch with other members of Congress the following day.  On June 7, Zuberi met with HFAC members, including Royce, Lieu, and Cicilline at the Charlie Palmer Restaurant for lunch.  Royce and Lieu had sponsored HR 2712.  Olson's calendar suggests that he attended as well.  Van Valkenburg's notes reveal that the members were receptive to considering Qatar's viewpoint.

79.  On June 13, Zuberi had lunch with Chairman Royce and the "former Qatar PM," likely referencing the former Prime Minister.  Zuberi reported to Allen and Olson at j.rutherford.allen@gmail.com and rickscafedxb@yahoo.com that Royce agreed to speak with Secretary Tillerson later in the day.

80.  On June 14, Zuberi arranged a dinner at the Monocle Restaurant between himself, Qatar's Minister of Defense, HFAC Chairman Royce, ranking minority member Engel, and Representatives Wilson, Rohrabacher, and Pittinger.

81.  According to calendar entries produced by Allen, on June 16, Allen met with an unknown Member of Congress at the Cosmos Club.  In his voluntary interview with the FBI, Allen claimed not to recall whether this meeting occurred.

82.  On June 28, Zuberi arranged another dinner at the Monocle Restaurant between Zuberi, Olson, Allen, Qatar's Foreign

35

Minister, and members of Congress "to discuss the situation in Qatar, the US's response, etc." Members of Congress scheduled to attend included Representatives Royce, Engel, Joe Wilson, Lieu, Cicilline, Waters, Cardenas, Kihuen, Murphy, and Carbajal. The government interviewed several members of Congress. Royce, Wilson, and Lieu recalled attending the dinner.

83. Lieu recalled attending two events; a lunch meeting at Charlie Palmer restaurant, and a dinner meeting at the Monocle restaurant. Lieu recalled seeing Zuberi, Allen, various representatives of Qatar, and some congressional members attending the Monocle dinner. Of the Qatari officials attending, Lieu recalled seeing the foreign minister and the brother of the Emir. The Qatari officials emphasized their views regarding the blockade, including its effect on family separation, and addressed the allegations made against them regarding their support for Hamas. Royce recalled advising the Qatari government to change course with regard to their funding of Hamas and encouraging the destabilization of neighboring governments. Lieu did not recall Olson or Allen saying anything during the meeting, but his impression was that Allen was there to support the Qatari officials and their position.

84. In his voluntary interview, Allen acknowledged that after returning from Qatar, he, Zuberi, Olson, and the Qatari Foreign Minister jointly met with members of Congress that included HFAC ranking Representatives Royce and Engel and an African American female representative whose name Allen could not recall, to discuss the diplomatic crisis.

J.    Allen's Business Dealings with the Government of Qatar

85.   Information produced by Allen in response to a subpoena revealed that Allen was seeking business deals with the Government of Qatar at the same time that he was lobbying U.S. government officials on its behalf.

86.   According to documents produced by Allen, in 2017, Allen had a contract with an Israeli security software company named Fifth Dimension ("5D").  Pursuant to this contract, Allen received a retainer of $10,000 per month and was entitled to 1.5% of the value of any business he generated.  In a November 3, 2016 email from j.rutherford.allen@gmail.com, Allen stated, "It had always been envisioned that my role with 5D would be to leverage friendships and contacts internationally in order to get 5D in front of potential clients and buyers[.]"  Allen went on to note, however, that the Qataris had asked Allen to endorse 5D's product to Qatar's Head of Intelligence and Minister of Defense—two of the Qatari government officials with whom Allen later met in Doha in June 2017.  Allen opined that his endorsement would "likely complete[] their decision making and result[] in Qatar deciding to buy the 5D product[.]"  According to the Fifth Dimension proposal, phase one of the project was valued at $72 million, which, if completed, would have netted Allen a commission of over $1 million.  The proposal also contemplated two follow-on phases, but did not list their prices.  To date, the FBI has not determined whether the Government of Qatar agreed to the 5D proposal or whether Allen received a commission as a result.

87.   In addition, in 2017, Allen was a member of the Board
of Directors of Spark Cognition, a Texas-based company selling
technology related to artificial intelligence.  On June 15,
2017, a few days after returning from the Doha trip, Spark
Cognition's President and CEO emailed Allen, thanking him for
his call the previous night and stating: "The potential you
cited with Qatar is genuinely exciting!  I am attaching a
proposal for you to share with their leadership."  The proposal
asked the Government of Qatar to sign onto a joint venture that
required a $30 million investment.  On June 18, 2020, Allen
replied to the CEO, "The brief is in their hands."  To date, the
FBI has not determined whether the Government of Qatar agreed to
the joint venture.[19]

K.   Obstruction of the Investigation

88.   Beginning in February 2017, the government served
subpoenas upon Zuberi's Avenue Venture companies for a large
variety of documents.  On November 6, 2017, the government
served additional grand jury subpoenas upon the Avenue Venture
companies seeking emails sent to and received from accounts
created by Zuberi under the domain avenueventure.com, including
those within the timeframe of the Qatar lobbying effort.  One of
the accounts responsive to those subpoenas was
richard.olson@avenueventure.com that had been set up by Zuberi
for Olson's use.  On July 17, 2019, the FBI served Olson with a
grand jury subpoena that sought a variety of documents,

_____

[19] A subpoena was served upon Spark Cognition and is
pending.

including those relating to Zuberi or Avenue Ventures within the timeframe of the Qatar lobbying effort.  On or about June 22, 2020, the government served Allen[20] with a grand jury subpoena that sought records related to Zuberi, Avenue Ventures, Olson, and Qatar.

89.  In response to the subpoena served upon him, Allen failed to produce email messages pertaining to the Qatar lobbying effort that were produced to the government by other sources.  The emails missing from Allen's production included incriminating documents relevant to the government's investigation.  For example, Allen failed to produce the June 7 and June 8 emails revealing that he sought a "speakers fee" and other compensation from Zuberi in connection with the lobbying effort.  Allen failed to produce June 8 emails that revealed Zuberi's purchase and delivery of Allen's plane ticket as well as a personal driver to transport him to the airport.  Allen failed to produce June 12 correspondence in which he acknowledged that the meeting with Qatari officials would not have taken place but for Zuberi's involvement.  Allen failed to produce multiple email exchanges on June 16 and 17 between himself, Zuberi, Olson, and Rumaihi in which (a) Allen reported that he had asked "the National Security Advisor to meet the [Qatari Foreign Minister and the Emir's brother]" and would "advise immediately if I hear anything," (b) that the importance of his action was that "[the Qatar] embassy request has to work

_____

[20] Subpoenas were served upon Van Valkenburg as well as other individuals on or about the same date.

its way up, our request will come down from above," (c) that
Zuberi and Rumaihi opined that "if we are doing the work then we
should be involved [in the meeting with the National Security
Advisor]", and (d) that in response, Allen replied, "We should
shift this conversation to WhatsApp."

90.   Allen did produce other emails from his
j.rutherford.allen@gmail.com account relating to his work on the
diplomatic crisis, most notably, his communications with
officials on the National Security Council.  However, Allen's
production was devoid of any documents that revealed his
financial interest in the diplomatic crisis and nearly devoid of
any documents showing the involvement of Zuberi and Olson.
Allen did not produce any of the emails between himself and
Zuberi from the inception of Allen's involvement on June 6
through June 25.  There is no mention of Zuberi at all until a
calendar entry for the June 15 dinner at Hay Adams Hotel that
merely notes "dinner w/ Imaad" without any mention of the
attendance of Qatari government officials or the purpose of the
meeting.  There is no mention of Olson until a calendar entry
for a June 16 meeting with no further description, a PowerPoint
proposal relating to the MAB, and discussions about payment
arrangements relating to the MAB.  (Based on the government's
current understanding, the contemplated work on the MAB does not
appear to implicate FARA.)  The only thing of substance produced
by Allen that reveals the involvement of Zuberi and Olson in
connection with his efforts with respect to the diplomatic
crisis is Allen's June 26 email to Zuberi and Olson reporting

that McMaster declined to meet with the Qatari officials.
Notably, this document was issued from Allen's Brookings email
account – therefore, if it had been deleted by Allen, it may
have remained on Brookings' servers.  For example, on or about
December 7, 2021, Brookings produced copies of two emails Allen
sent to members of the NSC, including McMaster, on June 9, 2017
and June 23, 2017, using his Brookings email account.

91.  Olson similarly failed to produce email messages
pertaining to the Qatar lobbying effort that the government
obtained from other sources.  The emails missing from Olson's
production included significant incriminating documents.  Olson
failed to produce the same June 8 email Allen failed to produce
with respect to the "speaking engagement" fee.  Olson failed to
produce the same June 16-17 email chains as Allen with respect
to Zuberi's, Allen's, Olson's, and Rumaihi's joint efforts on
behalf of Qatar, the importance of Allen's backdoor
communications with the National Security Advisor, and Allen's
suggestion that they move discussions about Zuberi's involvement
to more secure WhatsApp communications.  Olson also failed to
produce the June 26 email produced from Allen's Brookings email
account, reporting that McMaster declined to meet with the
Qatari officials.

92.  In his interview subject to a limited use immunity
agreement, Olson informed the government that in the spring of
2019, after he became aware of the government's investigation of
Zuberi, Zuberi asked him to delete emails pertaining to Allen
from his rickscafedxb@yahoo.com account to protect Allen from

government investigators.  Olson admitted that he indeed deleted
emails in response to Zuberi's request.  Search warrants for
Olson's rickscafedxb@yahoo.com account and Allen's
j.rutherford.allen@gmail.com account reveal that the emails
Allen and Olson did not produce no longer exist on the
providers' servers.

93.  For over two years, Zuberi avoided producing documents
from the richard.olson@avenueventure.com account, largely based
upon a claim that emails to and from Olson were protected from
disclosure under an attorney-client privilege.  On June 22,
2020, in response to Zuberi's counsel's claim that the grand
jury had expired and that prior subpoenas were unenforceable,
the government issued new subpoenas to Zuberi's Avenue Venture
companies requiring the production of emails to and from the
richard.olson@avenueventure.com account.[21]  Moreover, the
government informed Zuberi's counsel that "your client is not
presently a target of the investigation.  Nor do I presently
intend to make use documents produced in response to this
subpoena against Mr. Zuberi at sentencing."

94.  In response, on July 2, 2020, Zuberi's attitude with
respect to prior subpoenas changed.  Zuberi produced a variety
of incriminating documents that showed the joint participation
of Zuberi, Allen, Olson, and Rumaihi in the Qatar lobbying
campaign and Allen's solicitation of travel costs, the speaker's
fee, and a longer-term compensation arrangement.

---

[21] The government notified defense counsel that it reserved
the right to enforce prior subpoenas through compulsion and
contempt proceedings.

95.  In subsequent court filings, Zuberi argued that his work on the Qatar lobbying campaign represented a mitigating factor at sentencing and that his actions constituted a selfless attempt to stop a Middle Eastern War.  After his July 2 production of documents to the government, Zuberi apparently sought the help of others to support that narrative.  On the same day he produced the incriminating documents to the government, Zuberi contacted Van Valkenburg via WhatsApp, asking, "Can we catch up?"[22]  Two weeks later, on or about July 16, 2020, Zuberi contacted Olson and forwarded him[23] a copy of a prior email authored by Allen in June 2017 in which Allen acknowledged and thanked Zuberi "for facilitating what I think were very important talks with the Qataris.  They couldn't have taken place without your leadership."

96.  Olson's response to Zuberi's email shows that he was still of a mind to conceal their joint efforts on behalf of Qatar in connection with the diplomatic crisis and instead characterize it as having been related to the MAB.  Indeed, Olson suggested to Zuberi that they coordinate their stories to present a false portrayal of events to thwart the government's investigation.  On July 20, 2020, Olson responded to Zuberi's email and suggested that Allen's involvement pertained to the MAB, not the diplomatic crisis, stating,

---

[22] Van Valkenburg, who had received a subpoena from the government by this time, did not respond to Zuberi's outreach.

[23]  The email copied two other individuals Zuberi hired to assist his defense -- Robert Eatinger, an attorney, and Claude Arnold, a former Special Agent with the Department of Homeland Security.

"Imaad: I'm puzzled by the message you sent me last week. I've reviewed my records (including notes I took at the time) and they do not accord with your recollections:

- We had been discussing a Qatari defense project in the spring of 2017 (April & May).
- After the announcement of the blockade (5 June), you asked me if I knew any generals who might be interested in helping the effort. I suggested John Allen.
- On 6 June I introduced you by email to John Allen.
- We traveled to Doha 9-11 June.
- We continued working on the defense project through the summer, although at some point John Allen dropped out.
- I did not have any interaction with H.R. McMaster. I met him once, socially, I believe on 27 September 2017, but never discussed Qatar with him.

I suggest you review your chronology of events in light of the above. Let me know if I can help."

97.    In his immunized proffer with the government, Olson later admitted that his initial outreach to Allen pertained to the diplomatic crisis, not the MAB, and that Allen sought compensation for his work on the diplomatic crisis.

98.    On August 4, 2020, during a voluntary and recorded interview with the government, Allen offered the same false version of events that Olson suggested to Zuberi. Allen claimed that his initial contact with Zuberi related to the creation of the MAB. Allen also falsely claimed that he neither solicited nor discussed financial compensation with Zuberi in connection with the diplomatic crisis. Allen portrayed his involvement in the diplomatic crisis as he previously presented it to McMaster: as having arisen from his personal relationships with Qatari

officials and motivated entirely by selfless and patriotic reasons.

L.   Zuberi, Allen, and Olson Appear to Have Violated FARA

99.  According to Department of Justice database checks in July 2020, neither Zuberi, Allen, nor Olson has ever registered under FARA, 18 U.S.C. § 951, or 50 U.S.C. § 851 as an agent of the Government of Qatar.  However, several instances of Zuberi's, Allen's, and Olson's above-described efforts to influence U.S. government officials on behalf of Qatar appear to qualify as "political activities" as defined by FARA,[24] and therefore to require registration.

100. For example, at the request of Rumaihi (a foreign government official), Allen asked McMaster on the morning of June 9, 2017 to change the U.S. government's stated policy with regard to the diplomatic crisis and issue a statement urging restraint and de-escalation, which the U.S. government then did later that day.  Again, upon returning from Doha, Allen expressed Qatar's views while briefing Ms. Donnelly on June 12 and likely while briefing McMaster and Kushner on June 15. Finally, at the request of the Emir's brother on June 15, Allen twice — on June 16 and June 23 — asked McMaster to meet with the Emir's brother and the Qatari Foreign Minister in Washington, vowing that McMaster would "be impressed with the seriousness and dedication Qatar is prepared to exert in resolving this crisis."

---

[24] *See* 22 U.S.C. § 611(o) (defining "political activities") (discussed above).

45

101. Similarly, Zuberi, Allen, and Olson lobbied members of Congress.  For example, on June 28, 2017, Zuberi, Allen, and Olson met with the Qatari Foreign Minister and members of Congress who had sponsored the anti-Qatar House Resolution 2712, presumably to facilitate the Foreign Minister's advocacy on behalf of Qatar.

102. There is substantial evidence that these FARA violations were willful.  Zuberi has pleaded guilty to committing willful criminal FARA violations for unrelated conduct occurring in 2014.  Zuberi and Olson both attended the June 6, 2017 meeting with the Ashcroft firm in which registration under FARA was discussed.

103. In addition, as noted above, on June 7, 2017, Allen agreed to serve on a "Military Advisement Board" ("MAB") organized by Zuberi and Olson that would advise Qatar on how to improve its military capabilities.  A PowerPoint presentation prepared by Olson and Allen argued that the MAB would not require FARA registration.  On June 18, 2017, Olson sent Allen his draft, which included a bullet point stating, "There will be no requirement for FARA registration, i.e., no expectation of lobbying."  On June 19, Allen edited the PowerPoint to expand upon this provision, so that it read, "There will be no requirement for FARA registration, i.e., no expectation of lobbying or acting in the US as a foreign agent."  This edit shows that Allen was familiar with FARA and its registration requirements during the same period that he was seeking to influence U.S. government Executive Branch officials and members

of Congress on behalf of Qatar and that he communicated this aspect of the registration requirement to Olson.

104. When viewed in conjunction with Allen's misrepresentation to U.S. government officials regarding how he became involved in Qatar's efforts and his failure to disclose to those officials that he was simultaneously pursuing multi-million-dollar business deals with the Government of Qatar, Allen's knowledge of FARA's registration requirements strongly suggests that his violations of the statute were willful.

M.   Olson Violated the "Cooling Off" Provisions of Section 207(f)

105. On January 14, 2022, Olson executed a plea agreement with the government in which he agreed to plead guilty to a misdemeanor violation of the "cooling off" provisions of Title 18 U.S.C. Section 207(f).[25]

106. I have reviewed Olson's employment history and salary during the time that he was employed by the State Department as Special Representative to Afghanistan and Pakistan. Olson's salary subjected him to the one-year cooling off period for senior government officials set forth in Section 207(f).

107. Olson was well aware of the restrictions imposed upon him by the statute. Olson received annual training with respect to ethics laws that explained,

---

[25] Olson also agreed to plead guilty to a misdemeanor violation of 18 U.S.C. § 1018 for making a false writing based on material false statements he made in 2016 on an Office of Government Ethics form, on which Olson knowingly failed to disclose over $19,000 in airfare and lodging benefits he received from Zuberi.

First, the statute imposes a one-year cooling-off
period for senior employees. What this means is that
if you are a senior employee when you leave government
employment you may not represent another person or
entity back to the Department for a period of one
year. Second, the statute prohibits senior employees
from doing certain work for foreign governments for a
one-year period. Specifically, if you are a senior
employee, you may not represent a foreign entity back
to an officer or employee of any U.S. department or
agency. You also may not aid or advise such foreign
entity with the intent to influence a decision of any
officer or employee of any U.S. department or agency.

108. Prior to participating in the lobbying effort with
respect to the diplomatic crisis, Olson took steps to avoid
meeting with U.S. officials in violation of the first statutory
restriction, particularly Ambassador Smith.  In connection with
the lobbying effort he and Zuberi undertook on behalf of Qatar
from November 2016 through May 2017, which involved obtaining
from DHS preclearance facilities at Doha's international
airport, Olson suggested to Zuberi that he get Ambassador Smith
to embrace the effort.  Olson explained that he could not
participate because of the prohibitions, stating, "It will be
important to bring the US Ambassador on board Note: I know her
well but can't do it because of State's post-employment ethics
restrictions, but Imaad can charm her she's from LA.  The deal
closer would be for the Qataris help her get a new Embassy."

109. Olson nevertheless violated this provision when he met
with Ambassador Smith prior to meeting with the Emir and meeting
with U.S. policy makers after returning from Doha.  Olson
violated the second restriction of Section 207(f) by meeting
with Qatari officials in order to aid their effort to mold U.S.

policy, as well as participating in the lobbying effort generally.[26]

    N.    <u>There is Probable Cause to Believe that the SUBJECT ACCOUNTS Contain Evidence of the Aforementioned Crimes</u>

110. As noted above, Allen used j.rutherford.allen@gmail.com, in addition to his official Spark Cognition email account, to communicate with Spark Cognition's CEO and General Manager of Defense in June 2017 regarding future business deals with the Government of Qatar. Moreover, Allen used j.rutherford.allen@gmail.com in June 2017 to set up meetings with Qatari government officials located in the United States.

111. Emails produced by Olson reveal that he used rickscafedxb@yahoo.com to communicate with Zuberi and Sandweg with respect to obtaining preclearance facilities for Qatar during the period January through May 2017. As noted above, emails produced by Olson reveal that he used rickscafedxb@yahoo.com to communicate with Zuberi, Allen, and Rumaihi with respect to molding the U.S. response to the Qatar diplomatic crisis.

112. Zuberi used imaad.zuberi@mindspring.com, in addition to his Avenue Venture email account, to communicate with

_____

[26] In his voluntary interview subject to a limited use immunity agreement, Olson claimed to have not made substantive comments to either Ambassador Smith or Qatari officials when he met with them in Qatar. He stated he was uncertain as to what statements he made at the June 28 meeting with members of Congress.

Rumaihi, Allen, and Olson.  Zuberi also occasionally copied Rumaihi on his communications with Allen and Olson.

113. On or about January 26, 2022, a subpoena and preservation letter were sent to PROVIDER requesting that information related to the three email addresses imaad.zuberi@mindspring.com, rickscafedxb@yahoo.com, and j.rutherford.allen@gmail.com be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).  On or about February 7, 2022, PROVIDER produced documents related to SUBJECT ACCOUNTS 1 and 2 only. Per the documents produced, SUBJECT ACCOUNT 1 was active as recently as January 16, 2022, and SUBJECT ACCOUNT 2 was active as recently as January 19, 2022.

114.  On or about March 1, 2022, another subpoena and preservation letter were sent to PROVIDER requesting that information associated with Allen's iPhone telephone number, (571) 481-8325, be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).  On or about March 3, 2022, PROVIDER produced documents related to SUBJECT ACCOUNT 3.  Per the documents produced, SUBJECT ACCOUNT 3 was active as recently as February 24, 2022.

115. In my training and experience, I have learned that providers of cloud services, such as Apple's iCloud, allow iCloud account holders to backup data from their devices, including, but not limited to, photos, calendars, emails, text messages, as well as data from third-party applications such as WhatsApp.  I have also learned that such data backed up to the iCloud can remain unaltered even if the user deletes that data

from the native application.  For example, if a user has set up the Apple Mail Application on their iPhone, which allows them to manage mail from all their email accounts in one place, those emails could be backed up on the iCloud and remain unaltered even if the user deletes them from their native email applications, such as Gmail or Yahoo.

116. Based on the foregoing, I respectfully submit that there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of the Foreign Agents Registration Act, 22 U.S.C. §§ 611, *et seq.*, restrictions on former officers of the Executive Branch, 18 U.S.C. § 207(f), obstruction of justice, 18 U.S.C. § 1512(c), aiding and abetting, 18 U.S.C. § 2(a), and conspiracy, 18 U.S.C. § 371.

## V.   SERVICES PROVIDED BY APPLE, INC.

117. Based on records provided by Apple, I believe the SUBJECT ACCOUNTS have the following Apple services:  iCloud Account, iTunes Music Store, App Store, Game Center, Apple Online Store (AOS) Customer Account, iMessage, FaceTime, My Apple ID and iForgot.

118. Based on a review of information provided by Apple regarding its services, information provided by other law enforcement officers, and my training and experience, I am aware of the information contained in this section of the affidavit regarding Apple.

119. Apple is a United States consumer electronics company that produces devices, including the iPhone, iPad, and iPod Touch, Apple Watch, and Apple TV, all of which use Apple operating system software (including iOS, iPadOS, watchOS, and tvOS), and desktop and laptop computers which use the Mac OS operating system.

120. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage.

121. Apple provides email service to its users through email addresses at the domains mac.com, me.com, and icloud.com.

122. iMessage and FaceTime allow users of Apple devices to communicate with each other in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.  The iMessage and FaceTime services are exclusive to Apple devices.

123. iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services and can also be used to store Apple device backups and data associated with third-party apps.

124. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example,

iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.  iCloud can also be used to back up various settings and history of a user's activity, such as searches and web history.

125. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

126. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and (in some instances) wipe the contents of devices registered with the service.

127. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

128. The App Store and iTunes Store are used to purchase and download digital content. Apps can be purchased and downloaded through the App Store on Apple devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store.

129. Apple services are accessed through use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

130. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

131. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information

54

including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

132. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of

the Find My service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

133. Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an Apple device, Apple captures and retains the user's IP address and identifiers (depending on the type of device) such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

134. Apple provides users with five gigabytes of free storage space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and

iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

135. In some cases, users may communicate directly with Apple about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Providers like Apple typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

136. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the

criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

137. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

138. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

139. Account activity may also provide relevant insight
into the account owner's state of mind as it relates to the
offenses under investigation.  For example, information on the
account may indicate the owner's motive and intent to commit a
crime (e.g., information indicating a plan to commit a crime),
or consciousness of guilt (e.g., deleting account information in
an effort to conceal evidence from law enforcement).

140. Other information connected to an Apple ID may lead to
the discovery of additional evidence.  For example, the
identification of apps downloaded from the App Store and iTunes
Store may reveal services used in furtherance of the crimes
under investigation or services used to communicate with co-
conspirators.  In addition, emails, instant messages, Internet
activity, documents, and contact and calendar information can
lead to the identification of co-conspirators and
instrumentalities of the crimes under investigation.

141. Therefore, Apple's servers are likely to contain
stored electronic communications and information concerning
subscribers and their use of Apple's services.  In my training
and experience, such information may constitute evidence of the
crimes under investigation including information that can be
used to identify the account's user or users.

## VI.  BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER

142. I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at

a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information

associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

143. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

144. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the

identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

145. This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

146. As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search

62

team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

      b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VII.  REQUEST FOR NON-DISCLOSURE

147. Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.

148. There is reason to believe that such notification will result in (1) destruction of or tampering with evidence;

(2) intimidation of potential witnesses; or (3) otherwise seriously jeopardizing the investigation.

149. Although the most of the target/subjects are aware of the investigation, they are not aware of its extent and the methods through which the government is acquiring evidence. Consequently, disclosure of the subpoena may interfere with the government's ability to obtain relevant evidence.

150. Zuberi pleaded guilty in CR 19-642-VAP to a FARA offense in violation of 22 U.S.C. §§ 612, 618(a)(2), Federal Election Campaign Act offenses in violation of 52 U.S.C. §§ 30116, 30118, 30121, 30122, 30109(d)(1), and tax evasion in violation of 26 U.S.C. 7201.  In CR 20-155-VAP, Zuberi also pleaded guilty to obstruction of justice (witness tampering) in violation of 18 U.S.C. § 1512(c).  The sentencing court determined that Zuberi's obstruction extended beyond the single incident charged and that it included his deletion of emails and his paying several witnesses millions of dollars to silence them in connection with the government's investigation.  The court imposed a sentence of 12 years' imprisonment.

151. Olson has entered into a plea agreement with the government that requires his entering pleas of guilty to Making a False Writing in violation of 18 U.S.C. § 1018 and Aiding and Advising a Foreign Government with Intent to Influence Decisions of United States Officers in violation of 18 U.S.C. §§ 207(f)(1)(B), 216(a)(1).  In a recorded proffer session, Olson informed the government that in the Spring of 2019, Zuberi requested he delete emails in his own yahoo.com account to

64

protect Allen.  In July 2020, Olson also authored an email to Zuberi in which he suggested that Zuberi adopt a narrative of events that does not comport with the evidence developed by the government.

152. In response to a grand jury subpoena served upon him, Allen failed to produce incriminatory emails sent to and received from Allen's gmail.com account that were obtained by the government from other sources.  A search warrant of internet provider records demonstrates that the missing emails were deleted from Allen's gmail account.

153. Rumaihi currently holds diplomatic immunity and has not been contacted by government investigators in connection with this matter.  Should the search warrant be disclosed, it is likely that Rumaihi would undertake efforts to stymy the government's investigation and inform the other subjects of the steps the government is taking in pursuit of its investigation.

154.

## VIII.    CONCLUSION

155. Based on the foregoing, I request that the Court issue the requested warrants.  The government will execute these warrants by serving the warrant on the PROVIDERS.  Because the warrant will be served on the PROVIDERS, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_____
BABAK ADIB
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
April, 2022.

_____

UNITED STATES MAGISTRATE JUDGE